J-A18041-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF: K.T.W.E. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.S., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 282 WDA 2020 |

Appeal from the Order Entered February 4, 2020
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
O.A. No. 36 of 2019

BEFORE:   BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    FILED NOVEMBER 2, 2020

A.S. (Mother) appeals[1] from the order granting the petition filed by the Butler County Children and Youth Social Services (CYS) to involuntarily terminate her rights to her minor child, K.T.W.E., born in May of 2016, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1),(2), (5), (8), and (b). After careful review, we affirm.

The trial court accurately summarized the facts of this matter as follows:

On September 18, 2017, [CYS] received a report from local law enforcement of an incidence of domestic violence with a child present.  CYS Caseworker Michelle Womar responded to Mother's home.   Mother confirmed the domestic violence incident, explaining that she was the victim of Father's assault.   Mother confirmed that she had to climb out of a two-story window to escape Father at approximately 2:30 A.M.   Mother had placed Child in a playpen prior to leaving through the window.

_____

[1] Father filed a separate appeal from the order, which is docketed at 333 WDA 2020 and 334 WDA 2020.

Upon Caseworker Womar's arrival, Father was no longer at the home, and Caseworker Womar had no interaction with him. Caseworker Womar observed the home to be appropriate. Mother had secured Child's safety, and she was an appropriate caregiver. Caseworker Womar indicated at this time that Child was healthy and that Mother was cooperative.

Mother filed a Petition for Protection from Abuse (PFA) [against Father]. A temporary PFA was granted on September 18, 2017. Father was charged by the police with assault and endangering the welfare of a child. Mother informed Caseworker Womar that Father made no attempts to physically harm Child. The matter was closed with CYS on September 22, 2017. Mother filed a Motion to Withdraw and Discontinue the PFA action, and the Temporary Order was dismissed on September 28, 2017. The Order of Court discontinuing the PFA action ordered the original petition be forwarded to Butler CYS due to allegations in the petition of potential abuse or threat of abuse of a child.

On November 12, 2017, CYS again received a report from local law enforcement notifying CYS that Father had been arrested, Mother's whereabouts were unknown, and there was a child at the scene. CYS Caseworker Jonibeth Loverick and Caseworker Jessica Wagner went to the home. Upon their arrival, Child was with the police and was wearing only a diaper. The caseworkers noted that there was little food and only a few items for Child in the home. The home was in slight disarray, and there were pieces of plastic bags all over the floor near the couch. The police informed CYS that they were at the home based upon an anonymous tip that Father was at the address and had active warrants. The police also informed CYS that Father had barricaded himself in the home earlier, but he had voluntarily surrendered. Father was arrested, so there was no caretaker present for Child.

The police provided a phone number for Mother to CYS. Caseworker Loverick called the number and left a message for Mother. She also called and spoke to Maternal Grandmother, who reported that she did not know Mother's whereabouts. Caseworker Loverick inquired as to Maternal Grandmother's availability to be a placement, but based upon a prior criminal history and the emergent nature of the placement, Maternal Grandmother could not be a kinship placement at that time. She further explained to Maternal Grandmother that CYS would take further steps to determine if she was eligible for placement during

- 2 -

normal business hours. Around 1:30 A.M., having not been able to locate Mother, CYS contacted this judge for an emergency placement. This judge found that it would be contrary to Child's welfare to remain in the home and that CYS had made reasonable efforts to prevent the removal and to find an adult relative or kin for placement. Mother finally contacted CYS after 4:00 A.M. when Caseworker Loverick was returning from placing Child with his first foster home. Caseworker Loverick explained the process to Mother. Paternal Aunt called CYS the following morning and discussed what steps she could take to become a kinship placement for Child. On November 13, 2017, this judge issued a written court order to memorialize the court's findings and verbal order. On that same date, CYS filed a Dependency Petition pursuant to 42 Pa. C.S. § 6302(1).

Caseworker Kayla Somerville-Carraher (who was, at the time, Kayla Somerville) received the case as the primary caseworker. That same day, a Shelter Care Hearing was held before the juvenile court hearing officer. Father did not attend. Mother and Child were present. Mother was represented by counsel. A Guardian-Ad-Litem was present for Child. Father was assigned court-appointed counsel for the hearing. Father was present at the time of the hearing in another courtroom on criminal matters. The hearing officer found that Father has an extensive criminal history, and there was a history of domestic violence between Father and Mother. The hearing officer also found that Mother dropped the emergency PFA order on September 28, 2017, only a few days after it was issued. Mother also admitted to the caseworker that she used THC and Ecstasy. The hearing officer recommended the continued detention of Child and provided Mother with supervised visitation a minimum of three days per week for two hours per visit.

On November 14, 2017, Mother filed for and was granted a temporary PFA [against Father]. On November 22, 2017, Nia Ellis (Paternal Aunt) was approved for a kinship placement subject to certification as a placement provider within 60 days. Child was placed with Paternal Aunt at both Father's and Mother's request. At the time of Father's request, Father was incarcerated. An Adjudication Hearing was scheduled for November 22, 2017. Father's counsel requested a continuance due to the Sheriff's Office being unable to transport Father for the hearing from the Butler County Prison. All parties consented to the continuance. The hearing was rescheduled for November 27, 2017. On that

date, due to the late hour of starting the hearing and the requirement that the Sheriff have Father returned to the Butler County Prison by 4:30 P.M., the hearing was again continued.

Immediately prior to the Adjudication Hearing, Father made allegations, in a letter to CYS, claiming that Mother was a drug addict, had attempted to commit suicide on multiple occasions, drank too much alcohol, and was involved with CYS in Allegheny and Beaver Counties. He also stated that he did not feel that Child was safe with Mother and that Mother did not clean Child or change his diapers. Father claims now that he made all of the allegations up in an attempt to hurt Mother.

Following the Adjudication Hearing on December 19, 2017 and December 27, 2017, the hearing officer made findings of fact and found Child to be dependent pursuant to 42 Pa. C.S. § 6302(1). Mother and Father had a history of domestic violence incidents which involved the police. In September 2017, Father was charged with aggravated assault, simple assault, child endangerment, and theft after Mother escaped from a physical confrontation with Father and she escaped by jumping out of a second floor window, leaving Child with Father until the police arrived. The assault charges were dismissed after Mother gave contradictory testimony that favored Father at the preliminary hearing.

In November [of] 2017, Father was arrested for trespass while at Mother's home. The police also found narcotics all over the residence. Child was found on the floor. Mother was not home at the time, but rather, was at a bar. Father admitted to drug and alcohol use and an extensive criminal history that included burglary. Father has anger issues, and he admitted that he and Mother fight a lot.

Ultimately, the hearing officer found facts supporting domestic violence, drug and alcohol use, anger issues, mental health issues, criminal histories, and lack of stability for Mother and Father. On January 22, 2018, a Dispositional Hearing was held. Prior to the hearing, Mother and Father participated in Family Team Meetings and participated in creating a Service and Visitation Plan. Mother's objectives were to maintain a sober lifestyle, maintain good mental health, and meet Child's basic needs. Father's objectives were to manage his anger with appropriate coping skills, maintain a sober lifestyle, and meet Child's basic needs.

On January 22, 2018, an indirect criminal contempt for violation of Mother's PFA was filed, with a final hearing held on January 30, 2018. Father was found in contempt and sentenced to one to six months of incarceration, and Father was to be on parole for the remainder of any time upon release. A Final PFA Order was entered January 30, 2018, to expire January 30, 2019.

On January 25, 2018, Child was removed from the kinship placement with Paternal Aunt because the certification service provider notified CYS that the Paternal Aunt's home could not be certified. Marcia Ellis, (Maternal Grandmother), did not pursue certification at that time. Child was then placed in the kinship home of Maternal Great-Grandmother at Mother's request. After only a month or two, Maternal Great-Grandmother reported [that she was] having vivid nightmares about Father and reported that she was afraid that Father would come and take Child away. She requested [that] Child be removed from her home. Again, on March 9, 2018, Child was detained, and Child was placed in a confidential foster care.

On April 9, 2018, Father was arrested for violating the PFA again. Father admitted that he violated the PFA and was sentenced to six months of probation to run consecutive to the parole violation. Father's parole was revoked on the earlier violation.

A permanency review hearing was held on May 11, 2018. Mother had made moderate progress with the service plan. Father had made minimal progress, especially since he was incarcerated for violation of a PFA. Father had not participated in any services. On August 24, 2018, at a permanency review hearing, Mother had still made moderate progress with the service plan in that she was struggling to attend therapy. Father had still made only minimal progress. The same was true at the October 12, 2018 Permanency Review Hearing. Father did not appear at the hearing and had no contact with CYS since July 2018. Mother, however, had missed therapy sessions only due to work and was providing negative drug screens consistently. On or about November 12, 2018, CYS filed a motion for return of custody, which was granted. Child was returned to the custody of Mother on November 12, 2018 for an extended visit. At this time, Father was not participating in services. His last visit had occurred in July 2018. His only contact with Caseworker Laura Bathgate consisted of a voicemail where Father left no number for her to return his call.

Caseworker Bathgate testified that during the period of reunification, Mother's apartment was clean, Child was happy, and Mother was working. Mother was relieved of having to participate in drug and alcohol treatment at this time, but she was negative on one random drug screening. Mother was in mental health treatment. Child was in Mother's care for approximately two months.

On January 4, 2019, Mother called Caseworker Bathgate and stated that Father had been arrested at her apartment complex. Mother called because she was concerned that Father's arrest on the property would affect Child's placement with her. Mother hid the facts of the arrest from CYS. Father was arrested as an unauthorized tenant in Mother's apartment. The property manager and maintenance staff of the apartment complex saw Father on the property repeatedly. Father was arrested because he had active warrants.

At another indirect criminal contempt hearing in January 2019, Father admitted he violated the Final PFA Order again on January 4, 2019. Father was sentenced to two to six months of incarceration, with a period of parole for any time remaining after release. On January 10, 2019, Mother's Final PFA Order was extended to July 30, 2019.

Following Father's arrest at Mother's home, on January 8, 2019, Child was detained and placed in a new foster home. Following a Permanency Review Hearing on January 11, 2019, the court found that Father was on the premises of Mother's apartment as early as September, 2018, prior to the return of Child to Mother's custody and despite the PFA. Father was observed doing laundry, being in Mother's apartment, and socializing with employees. The landlord filed a complaint with the police. An incident occurred when the police located Father in Mother's apartment, and he fled by exiting a window, breaking the window screen and ultimately being tased by law enforcement and taken into custody, although Father disputes whether or not the window was broken and whether or not he was ever tased. Mother hid Father's activity in her home and their continued relationship. Mother had also failed to attend appointments for her mental health.

Caseworker Bathgate testified that the former foster care placement for Child was not willing to have Child returned to them

because of concerns about their safety and Father. Child was placed in a new confidential foster home. The permanency plan for Mother and Father remained the same as prior to Mother's reunification with Child. At the time that Child was placed with the new foster family, Mother's visits began occurring at Totin Family Services. . . .

Another criminal contempt complaint was filed alleging that Father violated the Final PFA Order on June 22, 2019, and when Father failed to appear for the hearing on July 2, 2019, a bench warrant was issued for his arrest. Father was arrested and the bench warrant was lifted. Father was ordered to appear for the hearing on August 1, 2019. Father did not appear for the indirect criminal contempt hearing and Gagnon I[2] hearing, and a bench warrant was issued for Father's arrest. The indirect criminal contempt and Gagnon I hearings were dismissed after the hearing on August 8, 2019.

On April 12, 2019, CYS filed a Petition to Involuntarily Terminate Parental Rights of Mother and Father pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), and (8). CYS also requested a Preliminary Review Hearing with a goal change from reunification to adoption. The matters were consolidated for trial. Trial was held on October 1, 2019, October 2, 2019, and October 23, 2019.[3]

Caseworker Somerville-Carraher testified that during her involvement with the case, she had concerns about Mother using drugs and alcohol. At Mother's first visit with Child on November 17, 2017, Mother smelled like alcohol and registered a blood alcohol content of .04, which was the highest reading that that particular test was capable of showing. Mother stated that she

_____

[2] Gagnon v. Scarpelli, 411 U.S. 778 (1973).

[3] At the hearing, Child was represented by a GAL, who argued in favor of termination. Mother does not raise any issues relating to Child's right to separate legal counsel. See In re Adoption of K.M.G., 219 A.3d 662, 670 (Pa. Super. 2019) (holding that (1) that "this Court's authority is limited to raising sua sponte the issue of whether the orphans' court violated Section 2313(a) by failing to appoint any counsel for the Child in a termination hearing," and (2) we may not "review sua sponte whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding" (citations omitted) (emphasis in original)).

had been out drinking the night before. At that time, CYS did not stop the visit because Mother was not impaired, but CYS advised Mother that she should not show up intoxicated for visits in the future. Caseworker Somerville-Carraher had Mother come in for a drug screening on December 29, 2017. Mother's results indicated that she was positive for cocaine and THC. Additionally, Mother had problems with incarceration due to missing hearings where bench warrants would be issued for her arrest. Mother was incarcerated three times. Twice, Mother was incarcerated for one day, and once, she was incarcerated for seven days. Mother's earlier periods of incarceration in January and August of 2019 were related to charges of public drunkenness. Mother's most recent period of incarceration occurred in September 2019 and was for resisting arrest, trespass, disorderly conduct, and public drunkenness. At the time of testimony on October 23, 2019, these charges were still outstanding with Mother having a hearing scheduled in Allegheny County on November 5, 2019.

\* \* \*

Caeworker Somerville-Carraher testified that while Child was placed with Paternal Aunt, Mother had to take two buses to get to her visits with Child, and as a result, Mother missed some visits. Mother raised concerns that Paternal Aunt was doing drugs while caring for Child. Mother wanted Child removed from Paternal Aunt's care and placed with her mother and grandmother. Later, Mother said that it was her mother, Maternal Grandmother, who had a problem with Paternal Aunt being Child's placement.

Caseworker Bathgate received the case from Caseworker Somerville-Carraher. At the time, Child was still placed with Paternal Aunt. Paternal Aunt was working to complete the certification to be a kinship care placement for Child with Family Pathways. Caseworker Bathgate testified that in order to be certified, a placement has to complete the certification process within sixty days of starting it. On the forty-fifth day, Family Pathways called Caseworker Bathgate to inform her that they were concerned Paternal Aunt would not complete the certification process. Caseworker Bathgate called Paternal Aunt several times but was unable to reach her. Eventually, the sixty-day period ran, and Paternal Aunt had not completed the certification process. Caseworker Bathgate testified that she was not aware of other cases where a possible foster family had failed to complete the certification process within sixty days; however, Paternal Aunt had

- 8 -

not completed several steps, including getting a license, completing FBI fingerprinting, contacting Family Pathways, and completing a physical exam of Child. Additionally, Caseworker Bathgate testified that for some period of time, Father was using Paternal Aunt's address, which would have precluded her from being a placement for Child. Paternal Grandmother testified that Father never lived at that address, but she was not aware of whether or not that address was used on any documentation.

Paternal Grandmother testified at the termination hearing that she was in the process of completing the paperwork to be certified as a placement as of October 23, 2019. She had never proceeded with the process before because she did not want to interfere, and she thought that Mother would get Child back. Paternal Grandmother noted that Mother "will be a good mother one day." However, Paternal Grandmother just started the certification process at the end of August 2019.

Mother has had problems with the current foster family. Child is biracial, and his foster parents are Caucasian. At visits, Mother or Father has braided Child's hair, which the foster parents would then remove very soon after the visit. However, Caseworkers and Dr. Bernstein noted that the foster parents have sought out resources to learn how to properly care for a biracial child, especially in how to properly take care of Child's hair. Caseworker Tiffany Crotzer stated that the foster parents had indicated to her that they had removed the braids after Mother's visits because they were coming loose, Child was pulling them out, and they were getting matted and unclean. This court ordered the foster parents to stop removing Child's braids unless they had a legitimate reason, so the foster parents stopped touching Child's hair altogether. Then Mother complained to Caseworker Crotzer that Child's hair was dirty and unmaintained. Father has also raised some concerns regarding the differences in race between Child and foster parents, citing as an example that one of the foster parents' parent (foster grandparent) referred to Child's private parts as "black dingles" during bath time one night. Father was upset about the "black dingles" comment, but he admitted that he did not know in what context the comment was made. Father also stated that the few instances of Child's race being made an issue where not really problems for him, but he found it concerning that everyone else kept bringing up Child's race in relation to his foster parents.

Mother has alleged that Child told her that the foster parents were hitting him in the mouth and on the butt. Mother has called Childline to report abuse of Child with the current foster family. Mother alleges that Child was always covered in bruises, including an incident where Mother alleges that Child had a handprint bruise across his face, and that Child is not included in family activities. Mother alleges that foster parents told her that the marks on Child's face were mosquito bites.

However, Mother had also called Childline on the prior foster family. CYS Caseworker Olexsak testified that Mother has made numerous complaints about the prior and current foster parents, which she believed were made up. When Mother answered questions about the number of times that she made complaints of abuse by the foster parents, Mother was unsure of the number of times she made complaints, was unsure of when or what details she gave for each complaint, and was unsure of which foster parent she was alleging was responsible for a particular alleged injury. Further, Mother changed her testimony several times in relation to the alleged abuse.

Caseworker Olexsak testified that Father reported a handprint on Child's face in June 2019; however, Child indicated that the former foster parents were the ones who grabbed his face. Caseworker Olexsak testified that two reports were sent to Childline, which is investigated by the regional office, and not the local CYS office. One report was made in June 2019 that Child had been hit in the eye and had blisters on his feet. The second report was made in August 2019. Both investigations were conducted by the regional CYS office, and not the local Butler CYS agency, and were returned as unfounded. Child alleged, to Mother, that the current foster mother had used a red spatula to hit him on the butt. During the investigation, Child alleged that Mother had used a red spatula to hit him on the butt. Caseworker Olexsak testified that the photos Mother sent to CYS about any alleged abuse did not warrant any investigation based on the photos themselves, which depicted minor injuries such as small bruises and an old, healing scab.

Notably, Child makes a lot of allegations to Mother when not in the presence of any other adult, and when Child is interviewed, Child says something different than what Mother alleges he said to her. Despite these concerns raised by parents, the caseworkers report that at the foster parents' home, Child shares a room with their biological children and is included in family activities. The

foster parents' natural children get along with Child, and the foster parents have made, in Caseworker Crotzer's opinion, substantial efforts to understand and adjust to Child's hygienic and cultural needs.

As Caseworker Crotzer had only recently taken the case over in August 2019, Caseworker Bathgate testified that both Mother and Father were familiar with the objectives laid out in the service plan based on a meeting that she had with them. Mother's objectives were as follows: to maintain a sober lifestyle, maintain good mental health, and demonstrate an ability to meet Child's basic needs.

In order to demonstrate that Mother was maintaining a sober lifestyle, Mother was required to complete a drug and alcohol evaluation, follow through with any recommendations made through such assessment, submit to drug screenings two times per week and any requested random drug screens, and provide the agency with signed release forms for any completed treatment. Mother completed three drug and alcohol evaluations from 2017 to 2019, which were all based on self-reporting. After the second evaluation, Mother was recommended to begin outpatient counseling, but after she started treatment, the center recommended a higher level of treatment. Treatment ended when Mother was arrested on a bench warrant. Mother completed a third drug and alcohol assessment, and no further treatment was recommended. Mother was ordered to complete drug screening at Totin Family Services. Mother was consistent in attending after May 2018. Eventually, drug and alcohol treatment was removed from the permanency plan for Mother, marked as completed. After Child was re-detained in January 2019, drug and alcohol evaluation and treatment was again added to Mother's service plan due to her arrest for public drunkenness in February 2019.

In order to demonstrate that she was able to meet Child's basic needs, Mother was required to keep a calendar of her appointments and utilize the calendar to schedule appropriate transportation arrangements; choose healthy relationships with individuals who are drug free and safe to have around Child; maintain safe, stable housing with working utilities; and attend and actively participate in Child's medical appointments. Mother had been maintaining a residence at Old Plank Estates, but after her former apartment was broken into and damaged in July 2018, Mother moved to Greenview Apartments, which is based on

income. Mother reported to Caseworker Bathgate that she suspected that Father was the one who broke in and destroyed her apartment. Mother receives assistance with her utility payments, but she has had no problem adequately paying for those services. Mother attended several of Child's doctor appointments in 2018. In 2018, Mother was working at the Veterans Administration Hospital. Mother has changed jobs several times since the commencement of this case. Mother reported that she quit working at the Veterans Administration Hospital on the day that Father was arrested at her home, in January 2019, because she did not feel that she could go. From August to September 2019, Mother began working with Maternal Grandmother at Donny B's Restaurant. Mother is now employed at Iron City Vape Lounge. Mother's biggest problem in meeting this objective was her refusal to stay away from Father despite an active PFA and several accusations of domestic violence, including one where she alleged that he punched her in the face five times and threatened to burn the house down with her and Child inside. Additionally, in February 2019, Mother was involved in a domestic violence incident with another man, who she alleges was not her boyfriend. He threatened to kill her if she did anything to hurt him. This individual had a gun in his hand at the time of the incident and had to be removed by police. Mother claims that he was mad because Mother told him that they were not in a relationship.

In order for Mother to maintain good mental health, the service plan provided that she was to participate in individual counseling as recommended by her therapist and create a treatment plan, sign all necessary releases for her mental health providers to share information with CYS, participate in a psychiatric evaluation at a provider of her choice, and participate in domestic violence services through VOICe if eligible. Mother has been inconsistent in attending to her mental health needs. Mother initially began counseling with VOICe in 2017, where she completed a safety plan to address domestic violence issues with Father. In September 2017, Mother completed her assessment at Family [Psychological], but she was inconsistent with attending regular appointments. Mother became more consistent in maintaining regular appointments by the summer of 2018. Mother eventually left Family Psychological. She stated that this was because she was having a hard time being able to make appointments with her therapist because the therapist was not available often, which caused problems with her compliance with the service plan.

Mother began attending Wellness Works in March or April 2019. Her last appointment with Wellness Works was in May 2019. Mother stated that she left Wellness Works because of their inability to prescribe medication, so Mother went back to Family Psychological for their medication management abilities. Between May 2019 and August 2019, Mother did not participate in mental health treatment. Then, Mother went back to Family Psychological and had her initial evaluation on August 24, 2019. Mother had not had an appointment between the end of September and October 23, 2019, and no appointments were scheduled for the future.

Mother participated in visitation with Child at Totin Family Services. From April 2018 until August 2018, Mother had monitored visits. From August 2018 until October 2018, Mother had unsupervised visits with Child in the community. Mother consistently attended visits, and her interactions with Child were appropriate. The visits ended when Mother and Child were reunified in November 2018. Upon Child's re-detention in January 2019, Mother's visitation was restarted at Totin Family Services. Since visitation restarted, Mother only missed two visits, which were missed because she was incarcerated in August 2019. In mid- September 2019, Mother's visits returned to unsupervised in the community. Totin Family Services had recommended a decrease in the number of visits that Mother had because of Child's reactions. At the end of visits, Child did not want to separate from Mother, and Child made statements indicating that he did not want to have two mommies. Because Mother's visits are monitored and someone is not present the entire visit, Totin Family Services employees indicated that they do not know what Mother [was] saying to Child during visits. Since August 2019, the visits with Mother have started and ended at the Totin Family Services center. Since that time, Child's behaviors have stopped. Additionally, Child has a very heavy schedule for visitation. He visits Mother twice a week, Father once a week, Maternal Grandmother every other week, and Paternal Grandmother and Paternal Aunt every other week.

\* \* \*

After 18-19 months, none of the objectives were completed by Mother or Father. Child was removed in November 2017, and except for an extended visit from October 2018 until the beginning of January 2019, Child has been placed in kinship and/or non-

kinship foster care. Caseworker Crotzer indicated that there is still a safety threat on the part of the agency because Mother has not addressed the problems with domestic violence, her mental health, and her unhealthy relationships. She also noted that Mother was arrested in August 2019 for public drunkenness for the third time this year, which demonstrated to her that Mother's behaviors are still not under control and Child is at a significant risk of instability.

Dr. Eric Bernstein conducted a bonding assessment for Mother and Child and Father and Child. The bonding assessment entailed a "combination of methodology from interviews; a review of the collateral information; to contact, of course, with the referral source, in this case CYF; observations; and when necessary, psychological testing, combined with a written report to reflect everything [he] learned." Dr. Bernstein also did an assessment of Child's interactions with the foster parents. Dr. Bernstein noted that the foster parents are intimidated by Father due to what they know about domestic violence between Father and Mother; however, they were open to post-adoption contact with Mother. Dr. Bernstein opined that Child fits in well with the foster parents and their biological children. Dr. Bernstein indicated that there were no problems with the interactions between the foster parents and Child. Dr. Bernstein noted that calling many people mommy and daddy can cause problems for a child, and the foster parents had redirected Child away from calling them Mommy and Daddy to calling them Mommy Katie and Daddy Ryan.

Dr. Bernstein conducted a clinical interview, the Personality Assessment Screener, and the Beck Depression Inventory [(BDI)] for Mother and Father, which measures "for a wide range of personality factors from addition to psychopathology, depression, and anxiety." Mother acknowledged some depressive symptomatology. According to Mother's self-reporting on the BDI, "she contended that she follows rules, respects authority. Minimized any history of rebelliousness. She essentially portrayed herself as a well-functioning adult, even despite the diagnoses of generalized anxiety disorder [. . .] and major depressive disorder." Father did not consider that he had any issue with anger or temper, despite acknowledging domestic violence and acknowledging being arrested between 10 and 20 times, with 4 arrests for felonies. By Father's report, he managed to control his moods and emotions.

Dr. Bernstein found the interactions between Mother and Child to be concerning. His main concern was regarding the way that Mother corrected Child about terms of reference for her and Father and for the foster parents. He stated that Mother told Child that she did not want Child calling the foster parents "mommy" and "daddy." He felt that Mother was using inappropriate pressure when Child is too young to appreciate the terms, which, to Child, would indicate shame and disapproval. Dr. Bernstein conducted a personality test on Mother, which was all based on Mother's self-reporting. Mother's answers did not match the reality of the situation, and he noted that Mother had a depressive tendency.

Dr. Bernstein raised concerns about whether or not Mother could keep Father away if they were not in a relationship, stating that based upon Mother's characterization of the situation, it raised concerns about whether she could establish safe boundaries against Father if he attempted to reconcile or re-enter her life. Dr. Bernstein expressed concerns that Child will begin to emulate Father's illegal activity.

Dr. Bernstein noted that Father is less than truthful. One example he cited is the letter that Father wrote accusing Mother of being a drug addict, which he then later retracted. Father described it to Dr. Bernstein as "over exaggerating a whole bunch of nonsense." Father self-reported no problems with anger or any emotional problems. Dr. Bernstein's final recommendation was that the foster parents offer a safe and stable home for Child, where there is an absence of violence or drama. While Mother and Father love Child and intend to meet his needs, they do not.

Ultimately, Dr. Bernstein opined that severing the bonds with parents, or foster parents, may result in harm to Child, stating "ultimately, he is likely to be negatively impacted not only by the separation from his parents but also the lack of future support as he grows and develops in need of their guidance and care. Granted, however, if reunited with [Mother] or [Father], he is also at risk for compromise of his safety, well-being, and emotional health."

Dr. Bernstein supported terminating parental rights, testifying "weighing both the matter of reunification versus termination of parental rights, I support the court moving forward with the termination of both parents' rights and support the foster parents as an adoptive resource. No matter how the court decides, [Child]

will likely be negatively impacted by the loss of an important bond with his parents or established safety and stability provided for by his foster parents. What tips the scale in favor of adoption is the clear potential for increased risk of compromise to [Child's] need for safety and stability if the court reunified him and his parents."

At Mother and Father's request, Dr. Beth Bliss completed a bonding assessment for Child and Mother and Child and Father limited to the existence of a bond between parents and Child and whether Child would be harmed if the parental relationship was terminated. This [c]ourt ordered that Dr. Bliss was permitted to include the foster parents if it would inform the above issues. Dr. Bliss indicated that she got some background information from the parents, including that Child was removed due to domestic violence issues. Dr. Bliss concluded that Child is "closely bonded" with Mother and Father. She observed that the interactions between Mother and Child and Father and Child were natural. Child often repeated Father and showed a strong desire to be like Father. Father and Child held hands and read books. Dr. Bliss testified that Child has a "strong and positive attachment" and a "strong and positive bond" with Father. Dr. Bliss' testified, in her opinion, that "if the bond were severed, that it could harm [Child]." Dr. Bliss stated that kids who move around frequently can develop Reactive Attachment Disorder, where they have difficulty forming healthy reactions to people or attachment to people. Dr. Bliss indicated that her "fear would be that in severing these bonds that he does have, that he could have difficulty in bonding or attaching to others later on."

Dr. Bliss noted that with Mother, Child often sought her out. Child called her mom and loves her. Child and Mother talked during the entire session; Child shared experiences with Mother, and they practiced shapes and animal sounds. The interactions were natural. In Dr. Bliss' opinion, Child is "closely bonded" with Mother, stating that he has a "strong, necessary, and important bond with [Mother]." Dr. Bliss opined that "it would be psychologically harmful" if the bond between Mother and Child was severed. When questioned about the difference in her answers concerning whether it could or would harm Child, Dr. Bliss clarified that harm was one possible outcome. She further added that she did not know what would happen to a bond that Child might have formed with a foster parent if that relationship was severed.

Dr. Bliss did not perform any bonding between Child and the foster parents because she stated that it was not relevant to the questions posed by the [c]ourt. When asked if the bond between Mother and Child could have formed after Child was removed by virtue of their weekly visits, Dr. Bliss opined that a bond would likely form if Child spent two hours per week with any stranger but that it was unlikely that this level of bond would form solely from twice-weekly visits. She noted that Child's difficulty in transitioning between his parents and the foster parents was due to age-appropriate difficulties with separation, typical and normal for kids his age. Dr. Bliss noted that the extent of any harm that Child could face may be varied but that harm would likely still occur. Dr. Bliss did not review Dr. Bernstein's report and did not state any opinions as to Dr. Bernstein's methodology or opinions.

Trial Ct. Op. at 10-16, 20-24.

On February 4, 2020, the trial court issued an opinion and order granting CYS's petition to terminate Mother's parental rights under Section 2511(a)(1),(2), (5), (8), and (b). Mother timely appealed and complied with Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues:

1. Whether the evidence in the record is inadequate for the trial court to have concluded, by clear and convincing evidence, that grounds for involuntary termination of parental rights existed pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), and (8).

2. Whether the evidence in the record is inadequate for the trial court to have concluded that termination of parental rights was in the best interests of the child, as required by 23 Pa.C.S. § 2511(b).

3. Whether the trial court[] committed an error of law and/or abused its discretion in failing to adequately address the bond between Mother and Child.

Mother's Brief at 4 (some formatting altered).

## Challenge To Evidence Supporting Termination

In her first claim, Mother challenges the evidence supporting termination under Sections 2511(a)(1), (2), (5) and (8). Id. at 16. Mother argues that she has made progress towards maintaining a sober lifestyle, seeking mental health treatment, and meeting Child's needs. With respect to sobriety, Mother contends that although she "has had some problems of late with regard to charges of public drunkenness, she remains drug free." Id. at 20. Regarding mental health treatment, Mother argues that "[t]he only mental health therapy appointments Mother missed were due to [] scheduling conflicts and switches." Id. As to Child's basic needs, Mother claims that she maintained stable housing and her "progress was such that Child was reunified with her on November 12, 2018. This reunification was broken only through the actions of Father." Id. at 23. Mother also asserts that she "met her objective in maintaining a calendar of her appointments and used those calendars to schedule transportation," in addition to attending Child's appointments and visits with Child. Id.

CYS responds that the trial court properly terminated Mother's parental rights under Section 2511(a)(1), (2), (5) and (8).[4] CYS's Brief at 12. CYS contends that Mother "exhibited an overall lack of compliance with services" by failing to "follow through with recommendations, especially for mental health therapy, maintaining sobriety[,] and separating [C]hild and herself from Father." Id. at 17. CYS also argues that "Mother's history [of] alcohol

_____

[4] The GAL also filed a brief in support of terminating Mother and Father's parental rights to Child. GAL's Brief at 12-24.

and drug use and lack of sobriety is significant. During her testimony Mother acknowledged her alcohol abuse and prior failed attempts with drug and alcohol and mental health treatment as well as her recent criminal convictions for public drunkenness and incarceration." Id. Finally, CYS asserts that Child was out of Mother's care for a period of seventeen months and that, at the time of the hearing, Mother had not completed her service objectives or secured employment. Id. Therefore, CYS concludes that "[g]iven the length of the dependency case and Mother's . . . failure to complete services, the [t]rial [c]ourt did not err in finding that [CYS] met by clear and convincing evidence the grounds for termination of Mother's . . . parental rights." Id. at 18.

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not

equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section

2511(a)." In re M.T., 101 A.3d 1163, 1179 (Pa. Super. 2014) (en banc) (citation omitted).

Initially, we review the trial court's ruling under Section 2511(a)(8), which provides:

> § 2511. Grounds for involuntary termination
>
> (a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>               *    *    *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

In order to terminate parental rights under this subsection,

> an agency must prove by clear and convincing evidence that "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child."

In re C.L.G., 956 A.2d 999, 1005 (Pa. Super. 2008) (en banc) (citation omitted).

With regard to the second requirement, termination under subsection (a)(8) "does not require an evaluation of [the parent's] willingness or ability to remedy the conditions that led to placement of [the] child[]." In re R.J.S., 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted). Instead, subsection

(a)(8) "requires only that the conditions continue to exist" after the twelve-month period has elapsed. In re I.J., 972 A.2d 5, 11 (Pa. Super. 2009) (citation omitted). This Court has recognized that "by allowing for termination when the conditions that led to removal continue to exist after a year, [subsection 2511(a)(8)] implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities." Id. at 11-12 (quoting C.L.G., 956 A.2d at 1005) (additional citations omitted).

Here, the trial court addressed Section 2511(a)(8) as follows:

[I]t has been well over twelve months since Child's removal from Mother's care and the conditions which led to [Child's] removal still exist. Initially, Mother began to make progress, complied with the service plan, and even had Child returned to her for approximately two months on an extended visit. However, despite her initial progress, Mother has not remedied the circumstances that caused Child's removal. Mother participated in visitation, but she has been unable to maintain employment, quitting her job in January [of] 2019, after Father was arrested at her home in violation of the PFA. Mother has missed many mental health appointments. Mother had drug and alcohol treatment removed from her service plan and was then incarcerated on a bench warrant for public drunkenness shortly after that condition was marked as complete.

Because Mother cannot maintain her progress for any length of time, she has still not made any progress to remedy any of these problems. As the findings of facts demonstrate, the services offered to Mother have not been utilized to sufficiently remedy the circumstances that led to [Child's] removal. [CYS] has established, by clear and convincing evidence, that it would serve [Child's] needs and welfare to terminate Mother's parental rights. Moreover, even if Mother were to continue using services and start using them reliably, she could not remedy the circumstances with[in] a reasonable time. It has been almost two years since Child's initial detention in November 2017.

However, as stated above, Mother's most egregious failure has been her refusal to keep Child safe. Despite domestic violence and Mother's discussions with CYS about her fears of Father, Mother purposefully deceived CYS and her landlords and allowed Father to spend time in her home with Child without regard for her safety or Child's safety. Throughout this case, Mother and Father have lied and taken deceptive actions in order to circumvent the [c]ourt's orders, thereby placing Child at risk of harm.[5] Both have repeatedly demonstrated an intent to sidestep the safety measures in place while CYS made a good faith effort to assist them with reunification. Mother's actions are indicative that she puts her own interest in spending time with Father before Child's safety. In the alternative, Mother is easily manipulated by Father and makes poor decisions that place Child at risk.

Trial Ct. Op. at 38-39.

Following our review, we find no abuse of discretion or error of law in the trial court's ruling that CYS presented clear and convincing evidence to support termination of Mother's parental rights under Section 2511(a)(8). See S.P., 47 A.3d at 826-27; see also R.N.J., 985 A.2d at 276.

As noted by the trial court, CYS became involved with Child in September of 2017 after a domestic violence incident between Mother and Father. See N.T. Trial, 10/2/19, at 31. Child was subsequently removed from Mother's care in November of 2017 after Child was left unattended in Mother's home.[6] Id. at 31. At that time, Mother had a tumultuous relationship with

_____

[5] The trial court explained that "Mother purposefully deceived CYS and her landlords and allowed Father to spend time in her home with Child without regard for her safety or Child's safety." Trial Ct. Op. at 37.

[6] As explained by the trial court, Mother left Child with Father while she was at a friend's house. See Trial Ct. Op. at 2; see also N.T. Trial, 10/2/19, at 30-32. Father was arrested that night on a bench warrant and police were unable to get in contact with Mother. N.T. Trial, 10/2/19, at 30-35.

Father and also suffered from problems with drugs, alcohol, and mental health. Id. at 35, 56, 62, 70. Despite Mother's initial progress with her service plan objectives, Mother failed to maintain her progress and ultimately failed to remedy the circumstances that led to Child's removal. See Trial Ct. Op. at 36; N.T Trial, 10/1/19, 102, 104-105; N.T. Trial, 10/23/19, at 196-97.

Specifically, the trial court noted that shortly after drug and alcohol treatment were removed from Mother's service plan, she was arrested for public drunkenness. See Trial Ct. Op. at 16; see also N.T. Trial, 10/23/19, at 53-55. Further, although Mother initially attended her therapy appointments, the trial court found there was "no credible record evidence that Mother made progress with her mental health." Trial Ct. Op. at 31; see also N.T Trial, 10/1/19, 102, 104-105; 156-57.

Finally, throughout the pendency of this case, Mother has failed to separate herself from Father, despite the existence of a PFA, a history of domestic abuse, Father's criminal activity, and Mother's representations to CYS and the trial court. See N.T. Trial, 10/1/19, at 98; N.T. Trial, 10/23/19, at 196-97. Although Mother blames Father for Child's removal, the trial court explained that Mother's own actions demonstrate that she "puts her own interest in spending time with Father before Child's safety" and "is easily manipulated by Father and makes poor decisions that place Child at risk." Trial Ct. Op. at 39.

In sum, having reviewed the parties' arguments and the record, we find no basis to disturb the trial court's findings of fact, which were supported by

the record. Moreover, we discern no error in the trial court's legal conclusion that more than twelve months have elapsed since Child's removal, the conditions leading to Child's removal, namely Mother's mental health, alcohol abuse, and her problematic relationship with Father, continued to exist. See I.J., 972 A.2d at 11. As this Court has noted, "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities." Id. at 11-12. Accordingly, we affirm the trial court's ruling to terminate Mother's parental rights under Section 2511(a)(8).

Challenge To Trial Court's Conclusions Under Section 2511(b)

Mother also challenges the trial court's conclusions regarding Child's best interests under Section 2511(b).[7] Mother argues that "undisputed evidence demonstrated that a strong bond exists between Mother and Child" and that although "[b]oth experts testified that severing the bond would harm Child . . . the trial court did not adequately address how severance would affect [] Child." Mother's Brief at 15. Mother also claims that Dr. Bernstein "placed greater weight on Father's actions in recommending termination for Mother" and that Mother and Father's history of domestic issues "tainted his overall view of Mother's bond with Child apart from Father." Id. at 29. In sum, Mother argues that "[r]ather than evaluating Mother's parental rights and bond with Child in her own right, the trial court improperly incorporated

_____

[7] Although Mother's statement of questions contains two separate issues relating to Section 2511(b), she combines both issues into one section in her brief. Nonetheless, this does not impede meaningful review.

Father's actions and transgressions in its analysis of Mother" and failed to consider "her efforts to curb his abuse." Id.

Finally, Mother argues that the trial court should have given greater weight to Child's biracial status in evaluating Child's best interests under Section 2511(b). Id. at 30. Mother contends that Child's race was relevant to determining whether it was in Child's best interest to sever Mother and Father's parental rights and for him to remain with foster parents, who are Caucasian. Id. at 32. Mother contends that "Child is in the critical periods of his development, and therefore his biracial status and current exposure to positive cultural influences of his biological family" are significant to analyzing Child's best interests. Id.

CYS responds that although there is a bond between Mother and Child, "there was little evidence that the bond is positive and/or strong." CYS's Brief at 22.[8] Further, CYS contends that "[e]ven if there were such a bond, Child's need for safety, stability, and permanency outweigh any potential harm" to Child that would result from severing Mother's parental rights. Id.

_____

[8] The GAL notes that "[a]lthough Mother's situation is marginally better, her inability to keep away from Father, her lack of follow up for mental and drug and alcohol treatment and lack of stable employment continues to be problematic." GAL's Brief at 13. Further, the GAL asserts that when comparing Dr. Bernstein's written report with Mother's testimony, "it is easy to point out her inability to appreciate the seriousness of violence to her or around [C]hild in terms of knowing how to protect the child and ensure his safety." Id. at 14. The GAL also expresses concern that Mother's "minimization of the threats and incidents of violence in the past will result in the child being placed in dangerous situations if reunited with Mother and possibly having [C]hild develop a desensitization toward violence." Id.

Section 2511(b) states:

> (b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. See C.L.G., 956 A.2d at 1008. In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In In re E.M., 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

Nonetheless, the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, as "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." Id. at 267 (citation omitted). Further, "[t]he continued attachment to the natural parents, despite serious parental

- 27 -

rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." Id. (citations and quotation marks omitted).

In evaluating a child's best interests, the court may emphasize the safety needs of the child. In re K.Z.S., 946 A.2d 753, 763 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite the existence of some bond, where placement with mother would be contrary to the child's best interests); see also In re Adoption of J.N.M., 177 A.3d 937, 946 (Pa. Super. 2018) (reiterating that the detrimental effects of severing a parent-child bond could be outweighed by the need for safety and security). As this Court has noted, "a parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re B.,N.M., 856 A.2d 847, 856 (Pa. Super. 2004) (citations omitted).

Nonetheless, "[w]hen examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences." J.N.M., 177 A.3d at 944 (citation and quotation marks omitted). "In the case of an unhealthy bond, 'attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that

injury against the damage that bond may cause if left intact.'"  Id.  (quoting

T.S.M., 71 A.3d at 269).

Here, the trial court addressed Child's best interests as follows:

Both Dr. Bliss and Dr. Bernstein noted that terminating the parental bonds between Child and his parents could harm Child. Despite that, Dr. Bernstein supported termination of parental rights to Child because of several concerns that he raised, including Mother's ability to keep Child safe from Father and Father's propensity to be less than truthful in dealing with his ongoing problems with anger and domestic violence.  Despite a possible negative impact on Child from the separation from his parents, Dr. Bernstein still supported termination of parental rights because, in his opinion, Child's safety and stability outweighed the potential for speculative harm caused to Child by severing the bonds with Mother and Father.  This is demonstrated in Dr. Bernstein's testimony that in "weighing both the matter of reunification versus termination of parental rights, [Dr. Bernstein] support[s] the [c]ourt moving forward with the termination of both parents' rights and support[s] the foster parents as an adoptive resource.  No matter how the [c]ourt decides, [Child] will likely be negatively impacted by the loss of an important bond with his parents or established safety and stability provided for by his foster parents.  What tips the scale in favor of adoption is the clear potential for increased risk of compromise to [Child's] need for safety and stability if the [c]ourt reunified him and his parents."

Dr. Bliss, pursuant to the [c]ourt order that permitted her to conduct the bonding assessment between Mother and Father and Child, did not address whether the bond was outweighed by a need for safety, stability, and permanency.  Dr. Bliss' only inquiry was into whether or not a bond existed and what possible harm could occur from a severance of the bond.  She testified that harm was one possible outcome of severing the bonds.  Dr. Bliss did not opine on whether or not parental rights should be terminated and was not even aware of most of the background information, preferring, by her own testimony, to avoid collateral information that might bias her opinion of whether or not severing the bond might harm Child.  Further, Dr. Bliss never reviewed Dr. Bernstein's report, and she did not testify that any protocol used by Dr. Bernstein was inappropriate.  Dr. Bliss did not testify as to

how Child's bond with the foster parents may mediate any harm experienced by Child from termination of the bond with his parents.

As agreed by Dr. Bliss and Dr. Bernstein, there is a possibility of harm to Child if his bonds with Mother and Father were severed. However, Dr. Bernstein noted, and this [c]ourt agrees, that the risk to safety and stability faced by Child if he is reunited with Mother and Father outweighs the potential for harm if the bonds are severed.

Child is bonded with Mother and Father. Mother and Father love Child, and Child loves them. Child looks to Mother and Father for love. On visits, they play together and talk about things. The one thing that Mother and Father have consistently done since Child was detained is maintain their relationship with Child. However, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." T.S.M., 71 A.3d at 267. Stability and family permanence are critical to the health and welfare of dependent children and must take priority.

Despite Mother and Father's bonds with Child, Child's need for safety, stability, and permanency outweigh any potential harm to [Child] from the severing of [Mother and Father's] parental rights.

\* \* \*

Mother has failed to remedy her problems with drugs and alcohol and her mental health. Mother has demonstrated that she cannot or will not make sure that Child is safe in her care. Mother had Child returned to her in November 2018 on an extended visit. Child was removed again in January 2019 because Father was arrested on her property, despite an active PFA and concerns for domestic violence. Immediately after, she quit her job because she felt that she "could not go" after Father's arrest. She failed to secure other employment between January 2019 and April 2019 when the petition was filed. Additionally, right after that instance of Father's arrest, Mother was arrested for public drunkenness. Mother has missed many appointments to maintain her mental health. Mother makes excuses for why she is unable to go to or schedule her appointments. While Child is bonded with Mother and may experience negative consequences as a result of terminating her parental rights, any negative consequences Child

may experience from the severance of any bond with Mother are outweighed by his need for safety, stability, and permanency.

Worse than Mother and Father's failure to comply with the service plan is Mother and Father's lying and deceptive behavior designed to circumvent the [c]ourt's orders, placing Child at great risk of harm. Both have repeatedly demonstrated an intent to sidestep the safety measu[r]es in place to protect Child, putting their own desires before Child's safety.

Child has been involved with CYS for approximately two years of the three years and a half years since his birth, while Mother and Father have made no progress and continue to place Child at risk of harm. Child needs to be safe and stable above all else. Safety, permanency, and the well-being of Child "must take precedence over all other considerations." S.B., 943 A.2d at 973. Mother and Father's inability or unwillingness to remedy the problems that continue for them, most specifically the domestic violence and drug and alcohol problems, cause it to be in the best interests of Child to have parental rights terminated so that Child can find safety, permanency, and stability.

In this case, the parents have spent a lot of time comparing themselves to the foster parents; however this is not the standard in an involuntary termination of parental rights case that involves agencies. Trial courts should pay the utmost attention to discerning the effect on Child of permanently severing parental bonds; however, the Adoption Act specifically provides that a pending adoption is not a prerequisite to terminations of parental rights that involve agencies like CYS. In re T.S.M., 71 A.3d at 267. This court understands that best practice is to have a stable and permanent family if parental rights are terminated, and the court may consider a child's bond with his or her foster parents. This court has given consideration to Child's bond and interactions with the foster parents in so far as it affects the developmental, physical and emotional needs and welfare of Child; however, this court has not, and will not, engage in a comparison of foster parents and natural parents. The safety, permanency, and stability of Child is the paramount concern.

Mother raises, in her brief, that it is not in Child's best interests to be removed from Mother and Father's care because of cultural competency concerns with the foster parents and requests that this Court take cultural competence into consideration in deciding

whether to terminate the parental rights, citing 55 Pa. Code § 3350.12, which sets forth criteria for adoptive applicants and not criteria for termination of parental rights. However, as Mother's brief notes, in conducting its 2511(b) analysis, the court may not balance the foster home against the natural parents. What criteria may be considered for adoptive applicants are not relevant in determining what is in the best interest of Child in an involuntary termination proceeding. This issue is a red herring. Any conversation surrounding the issue of cultural competency is related to the dependency action and not the Orphan's Court matter, and any questions raised by the court were in response to the nature of the combined dependency and orphan's court hearings. While the foster parents may have needed some cultural education, it was immediately provided, and the foster parents followed through with that training. This is not really at issue and is more of an issue with Mother and Father, understandably, not wanting anyone else to raise Child.

Mother and Father have raised the failure to place Child in a kinship home with Paternal Aunt or Paternal Grandmother. The ability or inability to be placed in a kinship home is not relevant to a termination proceeding. The court acknowledges that it is best practice in a dependency action to place a child in kinship care when possible and can consider this when considering the needs and welfare of a child. Unfortunately, in this case, neither Paternal Aunt nor Paternal Grandmother completed the certification process. There is no evidence that this was the result of CYS['s] action or inaction. Paternal Grandmother testified that she did not start the process timely because she assumed that Mother would get Child back. This appears to be a common presumption in Father's family. While the Paternal family waited for Mother to do everything right, they took little to no action. At best, Child was not placed with Father's family because of a lack of follow through. Regardless of how unfortunate it is, this is the factual scenario that the court is left with due to the inaction of Father's family in completing or starting the certification process.

In summation, this court recognizes that, regrettably, Child may suffer some grief and loss with the termination of rights of his parents and the termination of relationship with Father's extended family. However, after nearly two years of providing opportunities for reunification, the court must ultimately meet Child's best interest by ensuring a safe, stable, and permanent home for Child.

Trial Ct. Op. at 40-45.

Based on our review of the record, we discern no basis to disturb the trial court's finding that termination of Mother's parental rights would best serve Child's needs and welfare. See T.S.M., 71 A.3d at 267. The trial court acknowledged the existence of a bond between Mother and Child and the fact that Child may suffer grief or loss if that bond were severed. Trial Ct. Op. at 43; see also N.T. Trial, 10/2/19, at 71. Nonetheless, the trial court concluded that any negative consequences Child may experience were outweighed by his need for safety, stability, and permanency. See J.N.M., 177 A.3d at 944; see also B.,N.M., 856 A.2d at 856; see also K.Z.S., 946 A.2d at 763.

We also reject Mother's claim that the trial court was required to consider Child's biracial status when evaluating his best interests under Section 2511(b). As noted by the trial court, cultural competence is relevant when determining an individual's capacity for adoptive parenthood under section 3350.12 of the Pennsylvania Administrative Code. See Trial Ct. Op. at 44. The trial court acted within its discretion by emphasizing Child's need for safety and stability and concluding that, under the circumstances of this case, termination would nonetheless serve Child's best interests. See K.Z.S., 946 A.2d at 763.

Finally, Mother's claim that the trial court blamed her for Father's transgressions is not supported by the record. The trial court considered Child's bond with Mother, but ultimately concluded that termination would best serve Child's needs. Therefore, Mother is not entitled to relief.

Under these circumstances, we discern no abuse of discretion by the trial court in applying Section 2511(b).  See S.P., 47 A.3d at 826-27.  Clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights would best serve Child's developmental, physical, and emotional needs and welfare.  See R.N.J., 985 A.2d at 276.  Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/02/2020